IN THE CIRCUIT COURT OF SALINE COUNTY, ARKANSAS
CIVIL DIVISION

2014 AUG -7 PM 3:38

BY:

CHARLES DARREN WATTS                                    PLAINTIFF

v.                                    NO. 63CV-14-468-2

DEPUTIES and OFFICERS
HARLEY SOWELL; JUSTIN SMITH;
JEREMY HOLLEMAN; BRANDON BETTENCOURT;
SHERIFF BRUCE PENNINGTON;
COUNTY OF SALINE;
SOUTHERN HEALTH PARTNERS, INC.;
TIFFANY EICHLER and
JOHN and JANE DOES I-V                                    DEFENDANTS

## COMPLAINT

Comes now the plaintiff, Charles Darren Watts, by and through his
attorney James F. Swindoll and the Law Offices of James F. Swindoll, and
for his cause of action against the defendants, Deputies and Officers
Harley Sowell, Justin Smith, Jeremy Holleman, Brandon Bettencourt,
Sheriff Bruce Pennington, John and Jane Does I-V, Tiffany Eichler, and
Southern Health Partners, Inc., alleges and states:

Introduction

1.    This case is about the unconstitutional treatment of detainees
at the Saline County Detention Center, (hereinafter known as "Detention
Center"), and the specific treatment of Charles Darren Watts while in the

custody of the Detention Center beginning on August 10, 2013. As detained below, the Detention Center and its contractual medical provider, Southern Health Partners, Inc., (hereinafter known as "Southern"), and the deputies who worked at the Detention Center acted with unreasonable force and in an unconstitutional manner toward the plaintiff in repeatedly denying his requests for known necessary medical treatment, in using excessive force against him as punishment for his requests, and then in the denial of due process through the use of solitary confinement as a punishment against a pre-trial detainee.

2.      The plaintiff, Charles Darren Watts is a cancer survivor residing in Saline County, Arkansas. As a result of his cancer treatments he was left without a thyroid and without the ability to regulate necessary hormones in his body, which has resulted in bipolar disorder. The types of medicines the plaintiff takes are one which doctors do not recommend stopping cold-turkey as significant mental and physical health problems will result from a sudden change in the dosage of the medicines in a patient's system.

3.      Plaintiff knew of the need for him to take his thyroid and bipolar medicines at specific dosages and specific times in order to maintain the necessary hormone balances in his already fragile system and of the

2

consequences of missing doses of the medicines, and as such he notified officials at the Detention Center of his specific necessary medical needs upon being booked in on August 10, 2013, and Southern began their responsibility to provide plaintiff with medical care at the time of his booking.

4.      Deputies refused without cause to provide plaintiff with his medicines at the time when doses were scheduled to be received, commanded him to stop requesting his necessary medical treatments, Tasered and beat him for refusing to comply with their unconstitutional request, placed him in solitary confinement as punishment and then continued to provide incorrect doses at the incorrect times.

5.      The medical provider, Southern, within the Detention Center received plaintiff's necessary medicines, but did not insure that he received the medicines while in custody.   Southern' s employee, Tiffany Eichler, LPN, changed Watts prescriptions without having a license to do so, when she willfully chose to not dispense Watts all of his prescriptions, chose to change administration times, and chose to modify prescription doses without the authorization of a doctor.

3

PARTIES

6.     Charles Darren Watts is and was an American citizen, is and was a resident of Saline County, Arkansas, and at the time of the incident was entitled to all the rights and privileges afford to American citizens.

7.     Deputy Harley Sowell (hereinafter known as "Deputy Sowell") was an employee of the Detention Center in Saline County, Arkansas at the time of the unlawful and unconstitutional treatment against plaintiff beginning on August 10, 2013.

8.     Deputy Justin Smith (hereinafter known as "Deputy Smith") was an employee of the Detention Center in Saline County, Arkansas at the time of the unlawful and unconstitutional treatment against plaintiff beginning on August 10, 2013.

9.     Deputy Jeremy Holleman (hereinafter known as "Deputy Holleman") was an employee of the Detention Center in Saline County, Arkansas at the time of the unlawful and unconstitutional treatment against plaintiff beginning on August 10, 2013.

10.     Deputy Brandon Bettencourt (hereinafter known as "Deputy Bettencourt") was an employee of the Detention Center in Saline County,

4

Arkansas at the time of the unlawful and unconstitutional treatment against plaintiff beginning on August 10, 2013.

11.    Sheriff Bruce Pennington (hereinafter known as "Sheriff Pennington") was the Sheriff of Saline County, Arkansas, and was responsible for the promulgation and administration of the policies and practices of the Detention Center and for the training and supervision of Deputies and Officers of the Detention Center. Sheriff Pennington is a resident of Saline County and was a managerial employee of the Detention Center at the time of the unlawful and unconstitutional treatment of plaintiff beginning on August 10, 2013.

12.    Defendant County of Saline is an Arkansas County and is responsible for the policies and procedures and practices implemented in its various agencies including the Detention Center and is responsible for the acts and omissions of its employees herein, through the doctrine of respondeat superior.

13.    Southern is a foreign for profit corporation whose principal place of business is 2030 Hamilton Place Blvd., Chattanooga, Tennessee 37421 and whose registered agent is The Corporation Company, 124 W. Capitol, Suite 1900, Little Rock, Arkansas 72201.

Southern was the medical provider within the Detention Center, and was responsible for insuring detainees at the Detention Center received necessary medical treatment. The contract between the Detention Center and Southern is attached as Exhibit "A".

14. Tiffany Eichler, (hereafter known as "Eichler") was a licensed practical nurse employed by Southern to practice at the Detention Center at the time of plaintiff's incarceration beginning on August 10, 2013, and provided treatment to plaintiff during the time of his incarceration.

15. John and Jane Does I-V are individual medical provider employees of Southern yet unknown and other employees of the Southern who participated in and acted to deny plaintiff his necessary medical treatment during his detainment at the Detention Center beginning on August 10, 2013.

## VENUE AND JURISDICTION

16. Plaintiff brings this action pursuant to 42 §U.S.C. 1983 and Fourteenth Amendment to the Constitution of the United States.

17. Subject Matter Jurisdiction is proper in this court pursuant to 28 U.S.C §1331; 28 U.S.C. §1343 and U.S.C. §1367(a). This court has supplemental jurisdiction over plaintiff's state law claims for assault and

6

battery pursuant to 28 U.S.C. §1367(a) as the claims form part of the same controversy as the 42 U.S.C. §1983 claim.

18. Venue is proper in this court pursuant to 42 U.S.C. §1391 (b) as the acts complained of occurred in Saline County, Arkansas.

<u>Facts and Allegations</u>

19. On August 10, 2013, Charles Darren Watts was arrested by officers of the City of Benton Police Department for failure to pay a fine and was detained and placed into the custody of the Detention Center.

20. That at the time of his booking as a detainee, Charles Darren Watts provided his prescriptions with dosage instructions to Deputies at the Detention Center, and informed them of his need to take the medicines at the stated times and dosages at the medicines were necessary treatment for his thyroid and bipolar disorders. That according to the contract between Saline County and Southern, Southern's responsibility for medical care began at the time of plaintiff's booking into the Detention Center.

21. That at approximately 5:00am on August 10, 2013, plaintiff requested that he be provided with his prescriptions, as there was a need

7

for the prescriptions to be given in exact dosages and at exact times in order to be effective.

22.   That Deputies denied plaintiff his prescriptions, and threatened to physically harm him if he kept requesting his prescriptions.

23.   That Southern staff including Eichler were deliberately indifferent to plaintiff's known necessary medical care by failing to administer his prescriptions in the correct dosages or at the correct times, including failing to provide him with his August 10, 2013, morning doses of his medicines.  That as a result of being forced to go "cold-turkey" off of his thyroid and bipolar medications, plaintiff suffered mental and physical injuries.

24.   That plaintiff continued to request his medicines, even after being told to stop demanding them.

25.   That as a result of his continued demands for his prescriptions, Deputies entered the holding cell where plaintiff was located with Tasers drawn.

26.   That upon entering the cell, the Deputies used unconstitutional and excessive force when the Deputies collectively assaulted the plaintiff, Deputy Sowell Tasered plaintiff twice without cause to use force on him,

the Deputies battered the plaintiff, and placed him in a restraint chair as punishment for requesting his medicines.

27.    That Deputies then moved plaintiff to a solitary cell, where he remained in the restraint chair for a period of more than two (2) hours.

28.    A Deputy then release plaintiff from the restraint chair, but left him in solitary confinement, and provided him with some of his medicine, in an incorrect dosage at a time more than 45 minutes past when his medicine was scheduled to be taken.

29.    During his detention at the Detention Center, medical staff failed to provide plaintiff with the correct dosages of his medicines and failed to provide dosages at the correct timed intervals.

30.    That defendant Deputies and defendant medical provider, Southern, were aware of plaintiff's objective need for medical care and chose to deny him such medical care.

31.    That following plaintiff's beating and injury, the defendants conspired between themselves, under the guidance of the supervising official for the Detention Center to misrepresent the facts and circumstances involving the beating and injury of plaintiff to obscure their acts to avoid accountability for what they had done, including destroying

9

video evidence of the beating and detention, and the falsification of medical records within the Detention Center.

32.   That for all times relevant before August 10, 2013, and since the Sheriff, deputies and Southern and its employees have acted in unison to use excessive and unconstitutional force against the detainees and the Detention Center and have acted illegally and under color of law to physically beat and harm the detainees of the facility.

33.   That for all times relevant before August 10, 2013, and since the Sheriff, Deputies and Officers, and Southern and its employees have acted in unison to use refuse to provide medical care, which is known to be necessary, to the detainees and the Detention Center and have acted illegally and under color of law to deny medical care such that it harms the detainees of the facility.

34.   The County of Saline and Sheriff Pennington had a duty to implement an effective policy to train Sheriff's Deputies and the Detention Center personnel in the use of reasonable force used against detainees and further to monitor or supervise the actions of the deputies to insure that they adhered to those policies, including providing necessary medical care to detainees.

10

35.    The County of Saline and Sheriff Pennington knew or should have known that unconstitutional force was being used against detainees based on the number of lawsuits and grievances filed against them based on the unconstitutional use of force in the Detention Center.

36.    In spite of their notice of the unconstitutional use of force in the Detention Center, the County of Saline and Sheriff Pennington failed to provide proper training and failed to promulgate an effect policy regarding the use of reasonable force against detainees held in Detention Center and further failed to supervise or monitor the force being used at the detention facility.

37.    The County of Saline and Sheriff Pennington are responsible for the customs and policies observed by personnel of the Detention Center and had a duty to effectively monitor and supervise the use of force being used by the deputies on detainees.

38.    The defendants County of Saline and Sheriff Pennington knew of their constitutional duty to hire, train and discipline and supervise officers in a manner consistent with the United States Constitution and to implement policies, practice, and procedures to ensure that deputies executed their duties in a constitutionally permissible manner.

11

39.    Defendants the County of Saline and Sheriff Pennington knew that their acts, omissions and policies regarding treatment of detainees at the Detention Center would result in the use of excessive force against detainees and deliberate indifference to the dangers posed to detainees.

40.    That the aforesaid deficiencies have created an atmosphere of terror and torture at the Detention Center caused many detainees to be deprived of their constitutional rights and to endure beatings and injuries inflicted by the deputies and employees of the detention facility as hereinafter alleged.

## COUNT I

### Violation of 42 U.S.C. § 1983, and Amendment XIV of the Constitution of the United States- Excessive Force Against Defendant County of Saline, Deputies Sowell, Smith, Holleman, and Bettencourt, and Bruce Pennington in their Individual and Official Capacities

41.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-40.

42.    That as a detainee in the Detention Center on August 10, 2013, plaintiff was entitled to the rights of all citizens of the United States and was further entitled to protection from the deputies and employees of the Detention Center including but not limited to, protection from excessive

force and unreasonable restraint.  This was a right guaranteed under the Fourteenth Amendment of the Constitution of the Unites States.

43.    That despite plaintiff's constitutional rights, Deputies named herein, acting in their official and individual capacities, with the approval of the Sheriff of Saline County beat and abused plaintiff using disproportional and excessive force under the circumstances to cause physical injury.

44.    Defendant Deputies and Officers acted in their official and individual capacities, in that all of them, Sheriff Pennington and County of Saline promoted a custom and culture of malevolence toward detainees by encouraging brutality and refusal to protect detainees.

45.    Defendants the County of Saline and Sheriff Pennington failure to provide proper training and promulgate an effective policy regarding the use of reasonable force against detainees held in the Detention Center, after having been put on notice that unreasonable force was being used in the Detention Center, caused Defendant Deputies and Officers to engage in use of excessive force due to a lack of training and guidance in the reasonable amount of force to be used against a detainees.

46.    Defendants wanton aggression and intentional failure to provide protective care for detainees from their fellow Defendant Deputies and

Officers under the circumstances qualifies as cruel and unusual punishment and, as such, is prohibited by Amendment XIV of Constitution of the United States.

47.   Plaintiff is entitled to actual damages pursuant to 42 U.S.C. § 1983 and the laws of the State of Arkansas and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.   Plaintiff is entitled to punitive damages against the deputies named herein, and Sheriff Pennington pursuant to 42 U.S.C. § 1983 because defendants acted in their individual and official capacities, and in concert and with malice or with reckless disregard from which malice can be inferred against plaintiff on August 10, 2013.   The County of Saline and Sheriff Pennington failed to provide proper training and promulgate an effect policy regarding the use of reasonable force against detainees held in Detention Center, even after having been put on notice that unconstitutional and unreasonable force was being used against detainees.   In refusing to protect plaintiff from the deputies in charge of him during his detention and then intentionally failing to provide protection subjected plaintiff to cruel and unusual punishment prohibited by Amendment XIV of the Constitution of the United States.

## COUNT II

Violation of the Constitution of the State of Arkansas, Article 2, § 9-
Excessive Force Against Defendant County of Saline, Deputy Calvin Reed,
Defendants John and Jane Does I-V, and Bruce Pennington in their
Individual and Official Capacities

48.    Plaintiff restates and reasserts each of the allegations
contained in paragraphs 1-47.

49.    That as a detainee in the Detention Center on August 10, 2013,
plaintiff was entitled to the rights of all citizens of the United States and was
further entitled to protection from the deputies and employees of the
Detention Center including, but not limited to, protection from excessive
force. This was a right guaranteed under Article 2 §9 of the Constitution of
the State of Arkansas.

50.    That despite plaintiff's constitutional rights, the deputies named
herein, with the approval of the Sheriff of Saline County, Arkansas,
assaulted and battered plaintiff using disproportional and excessive force
under the circumstances to cause physical injury including improper use of
a Taser and also intentionally failed to provide him protection under the
circumstances as herein after alleged.

51.    The deputies and defendants John and Jane Does I-V acted in
their individual and official capacities, as did Sheriff Pennington and County

15

of Saline. They acted collectively to promote a custom and culture of malevolence towards detainees by encouraging brutality against detainees and then denying the emergency medical care the detainees required.

52.   Defendants John and Jane Does I-V and Sheriff Pennington's failure to supervise and provide proper training and to promulgate an effective policy, regarding the use of reasonable force against detainees held in the Detention Center, after having been put on notice that unreasonable force was being used in the detention center, caused the deputies and defendants John and Jane Does I-V to engage in the use of excessive force due to lack of training and guidance in the reasonable amount of force to be used against a detainee.

53.   Defendants' wanton aggression and intentional failure to provide timely medical care for detainees qualifies as cruel and unusual punishment and, as such, is prohibited by Ark. Const. Art., 2, § 9 (2012).

54.   Plaintiff is entitled to actual damages pursuant to and reasonable attorney's fees and costs. Plaintiff is entitled to punitive damages against the deputies, defendants John and Jane Does I-V and Sheriff Pennington because defendants acted with malice or with reckless disregard from which malice can be inferred the County of Saline and

16

Sheriff Pennington failed to provide proper training and promulgate an effect policy regarding the use of reasonable force against detainees held in the Detention Center, after having been put on notice that unreasonable force was being used in the detention center.  In refusing to protect plaintiff from the deputies in charge of him during his detention and in failing to provide emergency care, the defendants subjected plaintiff to cruel and unusual punishment prohibited by Amendment XIV of the Constitution of the United States.

### Count III

<u>Violation of 42 U.S.C. § 1983, and Amendment XIV of the Constitution of the United States- Denial of Due Process Against Defendant County of Saline and Defendant Deputies and John and Jane Doe I-V in their Individual and Official Capacities and Defendant Pennington in his Individual and Official Capacity</u>

55.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-54.

56.    Defendant Deputies and Officers denied plaintiff privileges and rights by summarily punishing him for demanding his necessary medical treatments by unconstitutionally assaulting and battering him, placing him in a restraint chair for a period of more than two (2) hours, and then placing

him in solitary confinement as punishment for not complying with their command to quit requesting his necessary medical treatments.

57.   Defendant Deputies and Officers acted in their individual and official capacities in that they acted pursuant to a general policy or custom at the Detention Center of executing penalties against detainees without granting due process or an opportunity to be heard about the alleged infraction, and instead assault and batter detainees, use a restraint chair as punishment and for extended periods of time, and place detainees in solitary confinement without cause.

58.   Defendants Saline County and Sheriff Pennington's failure to provide proper training and failure to promulgate an effective policy regarding proper procedures and disciplinary hearings for detainees accused of wrongdoing denied plaintiff's due process of law, resulting in additional deprivations of plaintiff's liberty and property.

59.   Defendant Deputies and Officers conduct in punishing plaintiff through assault, battery, the use of the restraint chair for a period of more than two (2) hours, and solitary confinement without allowing plaintiff to address the accusations against him to avoid the punishment amounts to a

denial of liberty without due process of law and, as such, is prohibited by Amendment XIV of the Constitution of the Untied States.

60.    Plaintiff is entitled to actual damages pursuant to 42 U.S.C. § 1983 and reasonable attorney's fees pursuant to 42.    U.S.C. § 1988. Plaintiff is entitled to punitive damages against defendants Deputies and Officers, John and Jane Does I-V and Sherriff Pennington pursuant to 42 U.S.C. § 1983 because the defendants collectively acted with malice or with reckless disregard from which malice can be inferred.    In refusing to protect plaintiff from the Deputies and Officers and for failing to provide necessary medical treatment, the defendant Deputies and Officers, Sherriff Pennington, and the County of Saline subjected plaintiff to cruel and unusual punishment prohibited by Amendment XIV of the Constitution of the United States.

### Count IV

<u>Violation of 42 U.S.C. § 1983, and Amendment XIV of the Constitution of the United States- Denial of Medical Care Against Defendant County of Saline and Defendant Deputies and John and Jane Doe I-V in their Individual and Official Capacities and Defendant Pennington in his Individual and Official Capacity</u>

61.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-60.

19

62.   That at all times relevant hereto the Deputies and Officers collectively were aware of plaintiff's need for necessary medical care before and after they assaulted, battered and summarily punished him as plaintiff notified personnel of his thyroid and bipolar conditions and the need for medication at booking.   They were objectively aware that the failure to provide that care would result in injury to him but still denied him necessary medical care.  Their failure to provide necessary medical care to plaintiff, a pre-trial detainee, constitutions a form of punishment upon a person not convicted of a crime.

63.   That despite their awareness, the Deputies and Officers and Sherriff Pennington acting for the County of Saline intentionally denied plaintiff such care and further actively prevented him from seeking such care and cause injury to his person as herein after alleged in violation of his constitutional rights as a pre-trial detainee provided under Amendment XIV of the Constitution of the United States.

64.   That it is the pattern, practice, or official custom of the Detention Center to deny detainees necessary medical treatment, and that the County of Saline and Sherriff Pennington were made aware of the practice after the death of Casey Babovec and series of lawsuits alleging

failure to provide medical care but condoned the practice by not making any policy changes.

65.    That as a result of the sudden change in the levels of plaintiff's thyroid and bipolar medications, he suffered bipolar episodes, depression and was forced to begin new lengthy regimes of titrating up on dosages of bipolar medication in an attempt to bring him back to a level where he could once again function in daily life.

### Count V

Violation of Ark. Code Ann. § 16-123-105, A.S.A. 16-62-102 and the Constitution of the State of Arkansas, Article 2 § 9 – Denial of Medical Care Against Defendant County of Saline and Defendant Deputies and John and Jane Doe I-V in their Individual and Official Capacities and Defendant Pennington in his Individual and Official Capacity

66.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-65.

67.    That at all times relevant hereto the Deputies and Officers collectively were aware of plaintiff's need for necessary medical care before and after they assaulted, battered and summarily punished him as plaintiff notified personnel of his thyroid and bipolar conditions and the need for medication at booking.  They were objectively aware that the failure to provide that care would result in injury to him, but still denied him

necessary medical care.  Their failure to provide necessary medical care to plaintiff, a pre-trial detainee, constitutions a form of punishment upon a person not convicted of a crime.

68.    That despite their awareness, the Deputies and Officers and Sherriff Pennington acting for the County of Saline intentionally denied plaintiff such care and further actively prevented him from seeking such care and cause injury to his person as herein after alleged in violation of his constitutional rights as a pre-trial detainee provided under the Arkansas Constitution (2012).

69.    That it is the pattern, practice or official custom of the Detention Center to deny detainees necessary medical treatment and that the County of Saline and Sherriff Pennington were made aware of the practice after the death of Casey Babovec and series of lawsuits alleging failure to provide medical care but condoned the practice by not making any policy changes.

70.    That as a result of the sudden change in the levels of plaintiff's thyroid and bipolar medications he suffered bipolar episodes, depression, and was forced to begin new lengthy regimes of titrating up on dosages of bipolar medication in an attempt to bring him back to a level where he could once again function in daily life.

## Count VI

### Assault by The Deputies

71.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-70.

72.    That the Deputies and Officers acted in such a manner as to create a reasonable apprehension of immediate harmful or offensive contact upon plaintiff, by threatening to beat and Taser him if he kept requesting necessary medical treatment.

73.    That the Deputies and Officers intended to cause that apprehension in plaintiff by making threats to his person while he was detained and utterly under their control.

74.    That plaintiff was actually put in that apprehension that he would be beaten or tased.

75.    That plaintiff suffered mental suffering and physical injury as a result of the threats to his person if he would not quit requesting necessary medical treatments in the form of his medications to treat his thyroid and bipolar disorders.

23

## Count VII

### Battery by The Deputies

76.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-75.

77.    That the Deputies and Officers acted with intent to cause some harmful or offensive contact with plaintiff and acted with the intent to create the apprehension of some harmful or offensive contact with plaintiff.

78.    That the Deputies and Officers actually caused harmful and offensive contact with plaintiff's person.

## COUNT VIII

### Medical Malpractice by Southern Health Partners, Inc., and Its Employees

79.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-78.

80.    Southern contracted with the Detention Center to provide medical care to inmates and detainees in custody.

81.    That Southern owed a duty to patients in the custody of the Detention Center to exercise ordinary care in the treatment of those patients.

82.    That after being notified of plaintiff's medical conditions and treatments, Southern and its medical employees had a duty to ensure that plaintiff received each of his medicines at the correct time and in the correct dosage, and that a medical provider exercising ordinary care would provide a patient with the correct dosages of thyroid and bipolar medicines and at the correct times because it is well known within the medical community the dangers to a patient of suddenly stopping or suddenly changing the doses of thyroid and bipolar medications.

83.    That Southern committed negligence by failing to ensure that plaintiff received his necessary medical treatments in the correct dosages and at the correct times.

84.    That Eichler, as an LPN, was not licensed to evaluate or change the administration of plaintiff's medications, and by having done both without consulting a licensed physician, she was essentially practicing medicine which is beyond her authorized scope a LPN in the State of Arkansas.

85.    The actions of the nursing staff created and caused a dangerous situation to plaintiff which caused him mental and physical injuries.

25

86.    That Southern did not provide appropriate supervision, training or orientation to nursing staff practicing within the Detention Center.  The absence of nursing notes and other documentation, failure to administer prescribed medicines in the prescribed dosages and authorized diagnosis and treatment of patients are below the accepted nursing standards.

87.    That as of the date of this filing, there have been more than 300 lawsuits filed against Southern for deliberate indifference to medical needs of inmates and detainees, and as such Southern has been put on notice that their nursing practices within jails and detention facilities are inadequate.

88.    Plaintiff is entitled to actual damages to compensate him for the mental and physical injuries he received as a result of the medical negligence of Southern, Eichler and John and Jane Does I-V, and punitive damages against Southern because the Southern acted with malice or with reckless disregard from which malice can be inferred.  In refusing to provide plaintiff with necessary and known medical treatments, for failing to supervise, train and orient staff to the needs of patients within the Detention Center and continuing to provide services which they were placed on notice were below the standard of care.

26

## Count IX

### Violation of 42 U.S.C. § 1983, and Amendment XIV of the Constitution of the United States- Denial of Medical Care Against Defendant Southern Health Partners, Tiffany Eichler, and Medical Providers John and Jane Doe's I-V in their Individual and Official Capacities

89.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-88.

90.    That Southern contracted with the County of Saline to provide medical treatment to detainees and inmates in the custody of the Detention Center.

91.    That Southern was acting as a State actor when it provided medical treatment to plaintiff while he was in the custody of the Detention Center on August 10, 2013, through August 14, 2013.

92.    That at all times relevant hereto Southern, Eichler and John and Jane Does I-V, collectively were aware of plaintiff's need for necessary medical care beginning when plaintiff was booked into the Detention Center with his medications and paperwork indicating his thyroid and bipolar disorders and prescription administration instructions.

93.    That Southern, Eichler and John and Jane Does I-V, were deliberately indifferent to plaintiff's known and necessary medical needs when they failed to administer his necessary thyroid and bipolar

medications within the administration time frame prescribed by his treating physician.

94.    That Southern, Eichler and John and Jane Does I-V, were collectively aware of the fact that the failure to provide that care would result in injury to plaintiff, but still denied him necessary medical care. Their failure to provide necessary medical care to plaintiff, a pre-trial detainee, constitutions a form of punishment upon a person not convicted of a crime.

95.    That Eichler, without a license to do so, changed plaintiff's prescriptions and indicated on her charts that she did not administer plaintiff his bipolar medications.

96.    That Eichler conspired with the Deputies and Officers to hide evidence of the Deputies and Officers battery of plaintiff by failing to document medical events including the time and dosage of prescription administration in a timely manner and creating false medical entries at later dates to indicate that plaintiff told her days before the record was created, that he had been either high or drunk at the time of the Deputies assault.

97.    That it is the pattern, practice, or official custom of the Southern to deny detainees necessary medical treatment, and that Southern, through

a series of more than 300 lawsuits from around the country, were put on notice that their medical treatment to detainees and inmates is inadequate, but condoned the practice by not making any policy changes.

98.    That as a result of the sudden change in the levels of Watts' thyroid and bipolar medications he suffered bipolar episodes, depression, and was forced to begin new lengthy regimes of titrating up on dosages of bipolar medication in an attempt to bring him back to a level where he could once again function in daily life.

## COUNT V

### Damages

99.    Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-98.

100.    That as a direct and proximate result of the collective acts and omissions as aforesaid plaintiff suffered great personal injury on August 10, 2013, while in custody at the Detention Center.    Plaintiff claims the following damages:

a.    Medical expenses in the past and reasonably certain in the future;

29

b.    Pain and suffering in the past and reasonably certain to be present in the future;

c.    Lost earning in the past and loss of ability to earn in the future;

d.    Scars and disfigurement; and

e.    Punitive damages to punish and deter similar conduct in the Detention Center and in the law enforcement community in general.

101.    That as a result of the injuries and damages as aforesaid the plaintiff has suffered damages and prays compensatory damages for a sum in excess of the minimum federal jurisdictional limits which at this time are Seventy Five Thousand Dollars, $75,000.00, exclusive of interest and cost and for punitive damages in a sum in excess of the minimum federal jurisdictional limits of $75,000.00 exclusive of interest and costs.

## COUNT X

### JURY TRIAL

102.    The plaintiff prays for a trial by jury.

**WHEREFORE,** the plaintiff, Charles Darren Watts, prays that he have judgment of and against the defendants for compensatory damages in a sum in excess of $75,000.00, for punitive damages in a sum in excess of

$75,000.00, for attorney's fees, for his costs herein expended, for a jury trial and for all other just and proper relief.

Respectfully submitted,

JAMES F. SWINDOLL
Law Offices of James F. Swindoll
Attorneys at Law
212 Center Street, Suite 300
Little Rock, Arkansas  72201
(501) 374-1290
(501) 374-3857 fax

James F. Swindoll, Bar No.  77131

31

## HEALTH SERVICES AGREEMENT

THIS AGREEMENT between Saline County, Arkansas (hereinafter referred to as "County"), and Southern Health Partners, Inc., a Delaware corporation, (hereinafter referred to as "SHP"), is entered into as of the 31st day of July, 2013. Services under this Agreement shall commence on August 2, 2013, and shall continue through December 31, 2014, in accordance with Section 6.1.

## WITNESSETH:

WHEREAS, County is charged by law with the responsibility for obtaining and providing reasonably necessary medical care for inmates or detainees of the Saline County Detention Center (hereinafter called "Jail") and,  .

WHEREAS, County and Sheriff desire to provide for health care to inmates in accordance with applicable law; and,

WHEREAS, the County, which provides funding as approved by the Saline County Board of Commissioners for the Jail, desires to enter into this Agreement with SHP to promote this objective; and,

WHEREAS, SHP is in the business of providing correctional health care services under contract and desires to provide such services for County under the express terms and conditions hereof.

NOW THEREFORE, in consideration of the mutual covenants and promises hereinafter made, the parties hereto agree as follows:

## ARTICLE I:  HEALTH CARE SERVICES.

1.1    General Engagement.  County hereby contracts with SHP to provide for the delivery of all medical, dental and mental health services to inmates of Jail.  This care is to be delivered to individuals under the custody and control of County at the Jail, and SHP enters into this Agreement according to the terms and provisions hereof.

1.2    Scope of General Services.  The responsibility of SHP for medical care of an inmate commences with the booking and physical placement of said inmate into the Jail.  The health care services provided by SHP shall be for all persons committed to the custody of the Jail, except those identified in Section 1.6.  SHP shall provide and/or arrange for all professional medical, dental, mental health and related health care and administrative services for the inmates, regularly scheduled sick call, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management,



EXHIBIT

A

2

pharmacy services management, administrative support services, and other services, all as more specifically described herein.

SHP shall be financially responsible for the costs of all physician and nurse staffing, over-the-counter medications, medical supplies, on-site clinical lab procedures, medical hazardous waste disposal, office supplies, forms, folders, files, travel expenses, publications, administrative services and nursing time to train officers in the Jail on various medical matters. SHP shall also be financially responsible for the costs of prescription pharmaceuticals for Saline County inmates. However, during the first four months of this Agreement, the costs of medications related to treatment of HIV+/AIDS, renal failure, hepatitis, cancer, muscular dystrophy, multiple sclerosis, hemophilia, Crohn's disease and tissue/organ rejection shall be the financial responsibility of the County. The costs of all x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail) and all medical and mental health services rendered outside the Jail shall also be the financial responsibility of the County during the first four months of this Agreement, or shall not otherwise be the financial responsibility of SHP.

a.    Limitations on Costs – Cost Pool. SHP shall arrange for medical services for any inmate who, in the opinion of the Medical Director (hereinafter meaning a licensed SHP physician), requires such care. County and SHP agree that, effective January 1, 2014, an annual cost pool shall be established in the amount of $30,000.00 to account for the costs of certain inmate medical services, as more fully described in this Section 1.2a. County acknowledges that, beginning on January 1, 2014, SHP's maximum liability for costs associated with all x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail) and all medical and mental health services for inmates rendered outside of the Jail will be limited by the pool amount of $30,000.00 in the aggregate for all inmates in each year (defined as a twelve-month contract period) of this Agreement. The costs of medications related to treatment of HIV+/AIDS, renal failure, hepatitis, cancer, muscular dystrophy, multiple sclerosis, hemophilia, Crohn's disease and tissue/organ rejection shall also be applied toward the annual cost pool. If the costs of all care as described in this Section 1.2a exceed the amount of $30,000.00 in any year, SHP will either pay for the additional services and submit invoices supporting the payments to the County along with an SHP invoice for one hundred percent (100%) of the costs in excess of $30,000.00, or in the alternative, will refer all additional qualifying invoices to County for payment directly to the provider of care. For all invoices payable to SHP as reimbursement for pool excess costs, such amounts shall be payable by County within thirty days of the SHP invoice date. For purposes of this

3

Section 1.2a, the pool amount will be prorated for any contract period of less or more than twelve months. County further acknowledges that the initial twelve-month period of the pool will run from January 1, 2014, through December 31, 2014, and that subsequent pool periods will coincide with the annual, twelve-month renewal periods of this Agreement.

The intent of this Section 1.2a is to define SHP's maximum financial liability and limitation of costs for those certain chronic-care medications (as identified in this Section 1.2), all x-ray procedures (inside and outside the Jail), all dental services (inside and outside the Jail), all hospitalizations and all other medical and mental health services rendered outside the Jail.

1.3    Specialty Services. In addition to providing the general services described above, SHP by and through its licensed health care providers shall arrange and/or provide to inmates at the Jail specialty medical services to the extent such are determined to be medically necessary by SHP. In the event non-emergency specialty care is required and cannot be rendered at the Jail, SHP shall make arrangements with County for the transportation of the inmates in accordance with Section 1.8 of this Agreement.

1.4    Emergency Services. SHP shall arrange and/or provide emergency medical care, as medically necessary, to inmates through arrangements to be made by SHP.

1.5    Injuries Incurred Prior to Incarceration; Pregnancy. SHP shall not be financially responsible for the cost of any medical treatment or health care services provided to any inmate prior to the inmate's formal booking and commitment into the Jail.

Furthermore, SHP shall not be financially responsible for the cost of medical treatment or health care services provided outside the Jail to medically stabilize any inmate presented at booking with a life threatening injury or illness or in immediate need of emergency medical care.

Once an inmate has been medically stabilized and committed to the Jail, SHP will, commencing at that point, then become responsible for providing and/or arranging for all medical treatment and health care services regardless of the nature of the illness or injury or whether or not the illness or injury occurred prior or subsequent to the individual's incarceration at the Jail. An inmate shall be considered medically stabilized when the patient's medical condition no longer requires immediate emergency medical

4

care or outside hospitalization so that the inmate can reasonably be housed inside the Jail. SHP's financial responsibility for such medical treatment and health care services shall be in accordance with, and as limited by, Section 1.2 of this Agreement.

It is expressly understood that SHP shall not be responsible for medical costs associated with the medical care of any infants born to inmates. SHP shall provide and/or arrange for health care services to inmates up to, through, and after the birth process, but health care services provided to an infant following birth, other than those services that may be delivered in the Jail prior to transport to a hospital, shall not be the financial responsibility of SHP. In any event, SHP shall not be responsible for the costs associated with performing or furnishing of abortions of any kind.

1.6    Inmates Outside the Facilities.  The health care services contracted in the Agreement are intended only for those inmates in the actual physical custody of the Jail and for inmates held under guard in outside hospitals or other medical facilities who remain in official custody of the Jail. Inmates held under guard in outside hospitals or other medical facilities are to be included in the Jail's daily population count. No other person(s), including those who are in any outside hospital who are not under guard, shall be the financial responsibility of SHP, nor shall such person(s) be included in the daily population count.

Inmates on any sort of temporary release or escape, including, but not limited to inmates temporarily released for the purpose of attending funerals or other family emergencies, inmates on escape status, inmates on pass, parole or supervised custody who do not sleep in the Jail at night, shall not be included in the daily population count, and shall not be the responsibility of SHP with respect to the payment or the furnishing of their health care services.

The costs of medical services rendered to inmates who become ill or who are injured while on such temporary release or work-release shall not then become the financial responsibility of SHP after their return to the Jail. This relates solely to the costs associated with treatment of a particular illness or injury incurred by an inmate while on such temporary release. In all cases, SHP shall be responsible for providing medical care for any inmate who presents to medical staff on-site at the Jail to the extent such care can be reasonably provided on-site, or shall assist with arrangements to obtain outside medical care as necessary. The costs of medical services associated with a particular illness or injury incurred by an inmate while on temporary release or work-release may be the personal responsibility of the inmate, or covered by workers' compensation, medical insurance, accident insurance, or any other policy of insurance which may provide payment for medical and hospital expenses. In the absence of adequate insurance coverage, such costs may, at the election of the County, be applied toward the annual cost pool described in Section 1.2a (beginning on or after January 1,

2014), but shall not otherwise be the financial responsibility of SHP.

Persons in the physical custody of other police or other penal jurisdictions at the request of County, by Court order or otherwise, are likewise excluded from the Jail's population count and are not the responsibility of SHP for the furnishing or payment of health care services.

1.7    Elective Medical Care.    SHP shall not be responsible for providing elective medical care to inmates, unless expressly contracted for by the County.  For purposes of the Agreement, "elective medical care" means medical care which, if not provided, would not, in the opinion of SHP's Medical Director, cause the inmate's health to deteriorate or cause definite harm to the inmate's well-being.  Any referral of inmates for elective medical care must be reviewed by County prior to provision of such services.

1.8    Transportation Services.    To the extent any inmate requires off-site non-emergency health care treatment including, but not limited to, hospitalization care and specialty services, for which care and services SHP is obligated to arrange under this Agreement, County shall, upon prior request by SHP, its agents, employees or contractors, provide transportation as reasonably available provided that such transportation is scheduled in advance.  When medically necessary, SHP shall arrange all emergency ambulance transportation of inmates in accordance with Section 1.4 of this Agreement.

## ARTICLE II: PERSONNEL.

2.1    Staffing.    SHP shall provide medical and support personnel reasonably necessary for the rendering of health care services to inmates at the Jail as described in and required by this Agreement.  County acknowledges that SHP will not provide medical staff on SHP-designated holidays, and there will be an allowance for a reasonable number of absences for medical staff vacation and sick days.

2.2    Licensure, Certification and Registration of Personnel.    All personnel provided or made available by SHP to render services hereunder shall be licensed, certified or registered, as appropriate, in their respective areas of expertise as required by applicable Arkansas law.

2.3    County's Satisfaction with Health Care Personnel.    If County becomes dissatisfied with any health care personnel provided by SHP hereunder, or by any independent contractor, subcontractors or assignee, SHP, in recognition of the sensitive nature of correctional services, shall, following receipt of written notice from County of the grounds for such dissatisfaction and in consideration of the reasons therefor, exercise its best efforts to resolve the problem.  If the problem is not resolved satisfactorily to County, SHP shall remove or shall cause any independent contractor,

6

subcontractor, or assignee to remove the individual about whom County has expressed dissatisfaction. Should removal of an individual become necessary, SHP will be allowed reasonable time, prior to removal, to find an acceptable replacement, without penalty or any prejudice to the interests of SHP.

2.4    Use of Inmates in the Provision of Health Care Services. Inmates shall not be employed or otherwise engaged by either SHP or County in the direct rendering of any health care services.

2.5    Subcontracting and Delegation. In order to discharge its obligations hereunder, SHP will engage certain health care professionals as independent contractors rather than as employees. County consents to such subcontracting or delegation. As the relationship between SHP and these health care professionals will be that of independent contractor, SHP will not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals. SHP will not exercise control over the manner or means by which these independent contractors perform their professional medical duties. However, SHP shall exercise administrative supervision over such professionals necessary to insure the strict fulfillment of the obligations contained in this Agreement. For each agent and subcontractor, including all medical professionals, physicians, dentists and nurses performing duties as agents or independent contractors of SHP under this Agreement, SHP shall provide County proof, if requested, that there is in effect a professional liability or medical malpractice insurance policy, as the case may be, in an amount of at least one million dollars ($1,000,000.00) coverage per occurrence and five million dollars ($5,000,000.00) aggregate.

2.6    Discrimination. During the performance of this Agreement, SHP, its employees, agents, subcontractors, and assignees agree as follows:

a.  None will discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin, except where religion, sex or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the contractor.

b.  In all solicitations or advertisements for employees, each will state that it is an equal opportunity employer.

c.  Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for the purpose of meeting the requirements of this section.

## ARTICLE III  REPORTS AND RECORDS

3.1    Medical Records.   SHP shall cause and require to be maintained a complete and accurate medical record for each inmate who has received health care services.  Each medical record will be maintained in accordance with applicable laws and County's policies and procedures.  The medical records shall be kept separate from the inmate's confinement record.  A complete legible copy of the applicable medical record shall be available, at all times, to County as custodian of the person of the patient.  Medical records shall be kept confidential.  Subject to applicable law regarding confidentiality of such records, SHP shall comply with Arkansas law and County's policy with regard to access by inmates and Jail staff to medical records.  No information contained in the medical records shall be released by SHP except as provided by County's policy, by a court order, or otherwise in accordance with the applicable law.  SHP shall, at its own cost, provide all medical records, forms, jackets, and other materials necessary to maintain the medical records.  At the termination of this Agreement, all medical records shall be delivered to and remain with County.  However, County shall provide SHP with reasonable ongoing access to all medical records even after the termination of this Agreement for the purposes of defending litigation.

3.2    Regular Reports by SHP to County.   SHP shall provide to County, on a date and in a form mutually acceptable to SHP and County, reports relating to services rendered under this Agreement.

3.3    Inmate Information.   Subject to the applicable Arkansas law, in order to assist SHP in providing the best possible health care services to inmates, County will provide SHP with information pertaining to inmates that SHP and County mutually identify as reasonable and necessary for SHP to adequately perform its obligations hereunder.

3.4    SHP Records Available to County with Limitations on Disclosure.   SHP shall make available to County, at County's request, records, documents and other papers relating to the direct delivery of health care services to inmates hereunder.  County understands that written operating policies and procedures employed by SHP in the performance of its obligations hereunder are proprietary in nature and shall remain the property of SHP and shall not be disclosed without written consent.  Information concerning such may not, at any time, be used, distributed, copied or otherwise utilized by County, except in connection with the delivery of health care services hereunder, or as permitted or required by law, unless such disclosure is approved in advance writing by SHP.  Proprietary information developed by SHP shall remain the property of SHP.

8

3.5  County Records Available to SHP with Limitations on Disclosure. During the term of this Agreement and for a reasonable time thereafter, County shall provide SHP, at SHP's request, County's records relating to the provision of health care services to inmates as may be reasonably requested by SHP or as are pertinent to the investigation or defense of any claim related to SHP's conduct. Consistent with applicable law, County will make available to SHP such inmate medical records as are maintained by County, hospitals and other outside health care providers involved in the care or treatment of inmates (to the extent County has any control over those records) as SHP may reasonably request. Any such information provided by County to SHP that County considers confidential shall be kept confidential by SHP and shall not, except as may be required by law, be distributed to any third party without the prior written approval of County.

## ARTICLE IV: SECURITY

4.1  General. SHP and County understand that adequate security services are essential and necessary for the safety of the agents, employees and subcontractors of SHP as well as for the security of inmates and County's staff, consistent with the correctional setting. County will take all reasonable steps to provide sufficient security to enable SHP to safely and adequately provide the health care services described in this Agreement. It is expressly understood by County and SHP that the provision of security and safety for the SHP personnel is a continuing precondition of SHP's obligation to provide its services in a routine, timely, and proper fashion.

4.2  Loss of Equipment and Supplies. County shall not be liable for loss of or damage to equipment and supplies of SHP, its agents, employees or subcontractors unless such loss or damage was caused by the negligence of County or its employees.

4.3  Security During Transportation Off-Site. County shall provide prompt and timely security as medically necessary and appropriate in connection with the transportation of any inmate between the Jail and any other location for off-site services as contemplated herein.

## ARTICLE V: OFFICE SPACE, EQUIPMENT, INVENTORY AND SUPPLIES

5.1  General. County agrees to provide SHP with reasonable and adequate office and medical space, facilities, equipment, local telephone and telephone line and utilities and County will provide necessary maintenance and housekeeping of the office and medical space and facilities.

5.2  Delivery of Possession. County will provide to SHP, beginning on the date of commencement of this Agreement, possession and control of all County

medical and office equipment and supplies in place at the Jail's health care unit. At the termination of this or any subsequent Agreement, SHP will return to County's possession and control all supplies, medical and office equipment, in working order, reasonable wear and tear excepted, which were in place at the Jail's health care unit prior to the commencement of services under this Agreement.

5.3    Maintenance and Replenishment of Equipment.  Except for the equipment and instruments owned by County at the inception of this Agreement, any equipment or instruments required by SHP during the term of this Agreement shall be purchased by SHP at its own cost. At the end of this Agreement, or upon termination, County shall be entitled to purchase SHP's equipment and instruments at an amount determined by a mutually agreed depreciation schedule.

5.4    General Maintenance Services.  County agrees that it is proper for SHP to provide each and every Inmate receiving health care services the same services and facilities available to, and/or provided to, other inmates at the Jail.

## ARTICLE VI:  TERM AND TERMINATION OF AGREEMENT

6.1    Term.  This Agreement shall commence on August 2, 2013. The initial term of this Agreement shall end on December 31, 2014, and shall be automatically extended for additional one-year terms commencing on January 1 of each year, subject to County funding availability, unless either party provides written notice to the other of its intent to terminate at the end of the period.

6.2    Termination.    This Agreement, or any extension thereof, may be terminated as otherwise provided in this Agreement or as follows:

> a.    Termination by Agreement.  In the event that each party mutually agrees in writing, this Agreement may be terminated on the terms and date stipulated therein.

> b.    Termination by Cancellation.  This Agreement may be canceled without cause by either party upon sixty (60) days prior written notice in accordance with Section 9.3 of this Agreement.

> c.    Annual Appropriations and Funding.  This Agreement shall be subject to the annual appropriation of funds by the Saline County Board of Commissioners.  Notwithstanding any provision herein to the contrary, in the event that funds are not appropriated for this Agreement, then County shall be entitled to immediately terminate

10

this Agreement, without penalty or liability, except the payment of all contract fees due under this Agreement up to and through the last day of service.

6.3  Responsibility for Inmate Health Care.  Upon termination of this Agreement, all responsibility for providing health care services to all inmates, including inmates receiving health care services at sites outside the Jail, will be transferred from SHP to County.

ARTICLE VII. COMPENSATION.

7.1  Base Compensation.  County will compensate SHP based on the twelve-month annualized price of $166,404.00 during the first five months of this Agreement effective August 2, 2013, through December 31, 2013, payable in monthly installments. Monthly installments during the first five months of this Agreement effective August 2, 2013, through December 31, 2013, will be in the amount of $13,867.00 each.

County and SHP agree that, effective January 1, 2014, the twelve-month annualized compensation price will adjust coinciding with the addition of an outside cost pool as more fully described in Section 1.2a of this Agreement.  Effective January 1, 2014, through December 31, 2014, the base compensation to SHP shall increase to the twelve-month annualized price of $196,404.00, payable by County in monthly installments.  Monthly installments based on the twelve-month annualized price of $196,404.00 will be in the amount of $16,367.00 each.  The total base compensation to SHP for the initial seventeen month contract period effective August 2, 2013, through December 31, 2014 will be $265,739.00.

7.2  Increases in Inmate Population.  County and SHP agree that the annual base price is calculated based upon an average daily inmate population of up to 180, as a monthly average.  If the average daily inmate population exceeds 180 inmates on average for any given month, the compensation payable to SHP by County shall be increased by a per diem rate of $0.75 for each inmate over 180 up to a limit of 220.  If the average daily inmate population exceeds 220 inmates on average for any given month, the compensation payable to SHP by County shall be increased by a per diem rate of $2.50 for each inmate over 220.  The average daily inmate resident population shall be calculated by adding the population or head count totals taken at a consistent time each day and dividing by the number of counts taken.  The excess in the range of 180 to 220, or excess over an average of 220, if any, will be multiplied by the applicable per diem rate and by the number of days in the month to arrive at the increase in compensation payable to SHP for that month.  In all cases where adjustments become necessary, the invoice adjustment will be made on the invoice for a subsequent month's services.  For example, if there is an average population for any given month of 185

inmates, resulting in an excess of five (5) inmates, then SHP shall receive additional compensation of five (5) times the applicable per diem rate times the number of days in that month. The resulting amount will be an addition to the regular base fee and will be billed on a subsequent monthly invoice.

This per diem is intended to cover additional cost in those instances where minor, short-term changes in the inmate population result in the higher utilization of routine supplies and services. However, the per diem is not intended to provide for any additional fixed costs, such as new fixed staffing positions that might prove necessary if the inmate population grows significantly and if the population increase is sustained. In such cases, SHP reserves the right to negotiate for an increase to its staffing complement and its contract price in order to continue to provide services to the increased number of inmates and maintain the quality of care. This would be done with the full knowledge and agreement of the Sheriff and other involved County officials, and following appropriate notification to County.

7.3    Future Years' Compensation.    The amount of compensation (i.e., annual base price and per diem rates as defined in Sections 7.1 and 7.2, respectively) to SHP shall increase at the beginning of each contract year. The amount of compensation shall increase on January 1, 2014, to the annualized amount stated in Section 7.1 of this Agreement, coinciding with the addition of a cost pool as described in Section 1.2a. For each of the renewal periods effective January 1, 2015, and January 1, 2016, the amount of compensation shall increase by two percent (2%). SHP shall provide written notice to County of the amount of compensation increase requested for renewal periods effective on or after January 1, 2017, or shall otherwise negotiate mutually agreeable terms with County prior to the beginning of each annual renewal period.

7.4    Inmates From Other Jurisdictions.    Medical care rendered within the Jail to inmates from jurisdictions outside Saline County, and housed in the Jail pursuant to written contracts between County and such other jurisdictions will be the responsibility of SHP, but as limited by Section 1.6. Medical care that cannot be rendered within the Jail will be arranged by SHP, but SHP shall have no financial responsibility for such services to those inmates.

7.5    Responsibility For Work Release Inmates.    SHP and County agree that SHP will be responsible for providing on-site medical services as reasonable and appropriate to County inmates assigned to work release and/or release for community service work for government or nonprofit agencies upon an inmate's presentation to SHP medical staff at the Jail. Notwithstanding any other provisions of this Agreement to the contrary, SHP and County agree that County inmates assigned to work release, including work for Saline County agencies, are themselves personally responsible for

12

the costs of any medical services performed by providers other than SHP, when the illness or injury is caused by and results directly or indirectly from the work being performed, or when such illness or injury is treated while the inmate is on work release. The costs of medical services associated with a particular illness or injury incurred by an inmate while on work-release may be covered by workers' compensation, medical insurance, accident insurance, or any other policy of insurance which may provide payment for medical and hospital expenses but shall not otherwise be the financial responsibility of SHP. In all cases, SHP shall be responsible for providing medical care for any inmate who presents to medical staff on-site at the Jail, including any inmate injured or infirmed while on work release or release for community service, to the extent such care can be reasonably provided on-site, or shall assist with arrangements to obtain outside medical care as necessary.

## ARTICLE VIII: LIABILITY AND RISK MANAGEMENT.

8.1    Insurance.   At all times during this Agreement, SHP shall maintain professional liability insurance covering SHP for its work at County, its employees and its officers in the minimum amount of at least one million dollars ($1,000,000.00) per occurrence and five million dollars ($5,000,000.00) in the aggregate. SHP shall provide County with a Certificate of Insurance evidencing such coverage and shall have County named as an additional insured. In the event of any expiration, termination or modification of coverage, SHP will notify County in writing.

8.2    Lawsuits Against County.   In the event that any lawsuit (whether frivolous or otherwise) is filed against County, its elected officials, employees and agents based on or containing any allegations concerning SHP's medical care of inmates and the performance of SHP's employees, agents, subcontractors or assignees, the parties agree that SHP, its employees, agents, subcontractors, assignees or independent contractors, as the case may be, may be joined as parties defendant in any such lawsuit and shall be responsible for their own defense and any judgments rendered against them in a court of law.

Nothing herein shall prohibit any of the parties to this Agreement from joining the remaining parties hereto as defendants in lawsuits filed by third parties.

8.3    Hold Harmless.   SHP agrees to indemnify and hold harmless the County, its agents and employees from and against any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind arising solely out of the aforementioned program of health care services provided by SHP. This duty to indemnify shall include all attorneys' fees and litigation costs and expenses of any kind whatsoever. County or Sheriff shall promptly notify SHP of any incident, claim, or lawsuit of which County or Sheriff becomes aware and shall fully cooperate in the defense of such claim, but SHP

13

shall retain sole control of the defense while the action is pending, to the extent allowed by law. In no event shall this agreement to indemnify be construed to require SHP to indemnify the County, its agents and/or employees from the County's, its agents' and/or employees' own negligence and/or their own actions or inactions.

County does hereby agree to indemnify and hold harmless SHP, its agents and employees from and against any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind arising solely out of the operation of the facility and the negligence and/or action or inaction of the Sheriff, the County or their employees or agents. This duty to indemnify shall include all attorneys' fees and litigation costs and expenses of any kind whatsoever. SHP shall promptly notify County of any incident, claim, or lawsuit of which SHP becomes aware and shall fully cooperate in the defense of such claim, but County shall retain sole control of the defense while the action is pending, to the extent allowed by law. In no event shall this agreement to indemnify be construed to require County to indemnify SHP, its agents and/or employees from SHP's, its agents' and/or employees' own negligence and/or their own actions or inactions.

## ARTICLE IX: MISCELLANEOUS.

9.1    Independent Contractor Status.  The parties acknowledge that SHP is an independent contractor engaged to provide medical care to inmates at the Jail under the direction of SHP management.  Nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, or a joint venture relationship between the parties.

9.2    Assignment and Subcontracting.  SHP shall not assign this Agreement to any other corporation without the express written consent of County which consent shall not be unreasonably withheld.  Any such assignment or subcontract shall include the obligations contained in this Agreement.  Any assignment or subcontract shall not relieve SHP of its independent obligation to provide the services and be bound by the requirements of this Agreement.

9.3    Notice.  Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party(s) at the following address or to any other person at any other address as may be designated in writing by the parties:

a.    County:     Saline County ~~Commission~~ Judge
                  200 North Main Street  Room 117
                  Benton, AR 72015

14

b.    SHP:    Southern Health Partners, Inc.
2030 Hamilton Place Boulevard, Suite 140
Chattanooga, Tennessee 37421
Attn: President

Notices shall be effective upon receipt regardless of the form used.

9.4    Governing Law and Disputes.    This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Arkansas, except as specifically noted.    Disputes between the Parties shall, first, be formally mediated by a third party or entity agreeable to the Parties, in which case the Parties shall engage in good faith attempts to resolve any such dispute with the Mediator before any claim or suit arising out of this Agreement may be filed in a court of competent jurisdiction.

9.5    Entire Agreement.    This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof.    No modifications or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto.    All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

9.6    Amendment.    This Agreement may be amended or revised only in writing and signed by all parties.

9.7    Waiver of Breach.    The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.8    Other Contracts and Third-Party Beneficiaries.    The parties acknowledge that SHP is neither bound by nor aware of any other existing contracts to which County is a party and which relate to the providing of medical care to inmates at the Jail.    The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of others who might otherwise be deemed to constitute third-party beneficiaries hereof.

15

9.9    Severability.  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

9.10    Liaison.  The Saline County Sheriff or his designee shall serve as the liaison with SHP.

9.11    Cooperation.  On and after the date of this Agreement, each party shall, at the request of the other, make, execute and deliver or obtain and deliver all instruments and documents and shall do or cause to be done all such other things which either party may reasonably require to effectuate the provisions and intentions of this Agreement.

9.12    Time of Essence.  Time is and shall be of the essence of this Agreement.

9.13    Authority.  The parties signing this Agreement hereby state that they have the authority to bind the entity on whose behalf they are signing.

9.14    Binding Effect.  This Agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors and assigns.

9.15    Cumulative Powers.  Except as expressly limited by the terms of this Agreement, all rights, powers and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

16

IN WITNESS WHEREOF, the parties have executed this Agreement in their official capacities with legal authority to do so.

SALINE COUNTY, AR
BY:

County Judge / County Sheriff

Date: _7-31-13_

ATTEST:

Date: _7-31-13_

SOUTHERN HEALTH PARTNERS, INC.
BY:

Jennifer Hairsine, President & COO

Date: _____